[L. A. No. 12569.   In Bank.—April 2, 1935.]

C. B. CALLAHAN, Respondent, v. FRANK MARTIN et al., Appellants.

C. E. McDowell and W. M. Greathouse for Appellants.

Pease & Dolley and Roy P. Dolley for Respondent.

THE COURT.—Plaintiff C. B. Callahan, as the owner in fee of real property in the county of Los Angeles, brought this action to quiet his title to said real property and "to oil, gas and other hydro-carbon substances and/or minerals in place within said land and to be produced, extracted and saved on or from said land". Defendants Frank Martin and Stella Meyer Martin, his wife, claim an interest in said oil and other substances by virtue of an assignment to them of three per cent of all oil, gas and other hydro-carbon substances produced on said property, which assignment was executed by Jose Gonzales, through whom plaintiff deraigns title to the fee by mesne conveyances. The trial court en-

tered judgment for Callahan. The appeal presents the question whether the assignment to defendants Martin made by Gonzales while he was the owner in fee of the land vested in said defendants oil rights which survived the conveyance of the land by Gonzales.

The facts may be stated briefly: On July 28, 1922, Jose Gonzales, a minor, through his guardian, executed an oil and gas lease covering said property, reserving to himself a one-sixth landowner's royalty in the oil and other substances to be produced, the oil royalty to be paid in money or in kind at the lessor's option. The lessees also agreed to pay a cash rental of $60 a month, to continue until the royalty agreed to be paid should equal or exceed that sum. The lease was for a term of twenty years, and so long thereafter as oil should be produced in paying quantities, unless sooner terminated or forfeited. It contained provisions for forfeiture for failure to perform the covenants and conditions of the lease.

On July 31, 1928, while said lease was in full force and effect, Gonzales and wife executed the instrument which forms the basis of defendants' claim herein. It is as follows:

"CONVEYANCE AND ASSIGNMENT OF ROYALTY INTEREST

"Know all men by these presents: That Jose Gonzales and Eulalia Gonzales, his wife, of Downey, California, hereinafter designated as the sellers, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to them in hand paid by Frank Martin and Stella Meyer Martin, husband and wife, of Whittier, California, hereinafter designated as the buyers:

"Do hereby grant, bargain, sell, convey, transfer, assign and set over unto said Frank Martin and Stella Meyer Martin, husband and wife, as joint tenants, three per cent (3%) landowner's royalty, being three per cent (3%) of all oil, gas and other hydro-carbon substances and/or minerals produced, extracted and saved on the following described real property located in the County of Los Angeles, State of California, to-wit:
[Description of property]
"To have and to hold unto the said buyers or the survivor of them, their heirs and assigns forever.

"In Witness Whereof, the said sellers have hereunto signed their names this 31st day of July, 1928.

"JOSE V. GONZALES
"EULALIA L. GONZALES"

Thereafter, on May 29, 1929, Gonzales and wife executed a deed conveying the fee in said real property, "subject to conditions, restrictions, reservations, easements, rights and rights of way of record", to John F. Tracey, and Tracey, by deed dated June 6, 1929, conveyed to C. B. Callahan, plaintiff herein. This conveyance was made subject to "conditions, restrictions, reservations, rights, rights of way and easements of record". The holder of the lease executed a quitclaim deed, dated May 28, 1929, to Gonzales and wife, with the object of terminating said lease. Callahan subsequently entered into a new lease after the conveyance to him from Tracey. All instruments, including the assignment to defendants Martin by Gonzales, were recorded within a few days after execution. A well was drilled on the property in 1922, and continued in production until about June 10, 1929. It does not appear from the record whether oil has been produced under the new lease executed by Callahan.

■ We are of the view that an assignment made by an owner in fee transferring an undivided interest in oil rights in his land is an assignment of an interest in real property, and enforceable against a grantee of the fee in the general estate. It follows that recordation of such an assignment of oil rights imparts constructive notice to a subsequent grantee of the fee in the general estate. In the case herein Callahan procured a guaranty of title, which described title as vested in him, but listed the assignment to the Martins as an encumbrance. It was stipulated at the trial that this guaranty "was received by Mr. Callahan at the time of the delivery of the deed by Tracey [Callahan's grantor] to Callahan". Since the Tracey-Callahan deed is dated June 6, 1929, and recorded June 24, 1929, and the guaranty is dated June 27, 1929, it is to be inferred that the guaranty of title was not delivered to Callahan until after the recordation of the deed to him. While it is probable that he had actual notice of the assignment to the Martins, prior to recordation of the deed to him, in the absence of any evidence on the point except this stipulation, we prefer to rest

our conclusion on the premise that recordation of said assignment charged him with constructive notice thereof.

The situation presented in the instant case is a usual one in the development of oil lands. At the time of the landowner's assignment of a three per cent royalty interest to the Martins, the land was subject to a lease for the production of oil and gas, under which the operating lessees were entitled to retain five-sixths of all oil and other hydro-carbon substances produced, rendering to the lessor-owner one-sixth, as a return for the privileges granted by the lease. It was not contemplated that the rights assigned to the Martins should in any way infringe upon the rights of the operating and producing lessee. The percentage assigned to the Martins was less than the percentage returnable to the landowner as his royalty, and was deductible from the landowner's share. To the lessee was given the exclusive right to prospect and drill for oil and gas for a period of twenty years, and for so long thereafter as oil and other hydro-carbon substances should be produced in paying quantities, with the right to such possession of the surface as was necessary and incidental to its oil operations. The persons to whom the landowner transfers varying percentages in oil to be produced on his land by royalty instruments are not equipped ordinarily to operate oil wells, but are investors, who desire to share in the profits from the development and sale of oil. The assignment of a royalty interest to the Martins herein was not limited to oil produced during the continuance of the lease, or during a fixed period of years, but was designed to transfer to them a perpetual interest in oil and other hydro-carbon substances to be produced from the land. It expressly provides that the assignment shall run to the "buyers, or the survivor of them, their heirs and assigns forever". Thus, the case involves the rights of an assignee of oil royalty under an assignment unlimited as to duration, not the rights of an assignee under an assignment limited to royalty to be realized from a designated lease.

The question to be determined in the instant case is as to the nature of the rights of the purchaser of the oil royalty interest. At the time of the transfer of the royalty interest to the Martins, on July 31, 1928, the lease was in full force and effect. Thereafter the lessees executed to the lessor,

Gonzales, and to his wife, a quitclaim deed, dated May 28, 1929, with the object of terminating the lease, and the well on the property ceased production on June 10, 1929. Callahan did not become the owner of the fee in the land until some time after June 6, 1929, probably after June 10th, when the well ceased production. The Martins did not claim in the court below that the termination of the lease without their concurrence was ineffective, or pray that it be reinstated, but, rather, seem to acquiesce in the acts of the lessor and lessees as an effectual termination. For the purposes of the instant case, we accept the termination of said lease as an established fact.

The nature of the interest of an assignee to whom an owner of land transfers a percentage interest in oil rights has been the subject of consideration in several recent cases in this state, to be noticed hereinafter, but so far has not been precisely defined. It is the contention of respondent Callahan herein that such a transfer is merely the personal contract of the owner of the land, at most a contract for the sale of oil brought to the surface and reduced to possession as personal property, and that it creates in the assignee no rights in oil produced after his assignor has transferred the fee in the land. The theory that assignees of percentage interests in oil rights have no enforceable rights in oil produced after a transfer by the assignor of the fee in the land is widely repudiated. The difficulty experienced in defining with exactitude the nature of the assignee's rights is due in part to the fact that the oil industry is of very recent development, while in this country, by statute and judicial precedent, our classification of property as realty or personalty is based on common-law definitions which crystallized in a time when oil interests were not the subject of judicial cognizance.

Some jurisdictions adhere to the theory that the owner of land has an estate in oil and gas beneath the surface in like manner as he has an estate in the surface; that oil and gas in place beneath the surface of land constitute a part of the land, and as such are real property, may be granted separate and apart from the surface, and when so granted vest in the assignee an estate in definite corporeal real property. This theory cannot be better enlarged upon than by the fol-

lowing quotation from *Texas Co.* v. *Daugherty,* 107 Tex. 226, [176 S. W. 717, L. R. A. 1917F, 989]:

"It is no longer doubted that oil and gas within the ground are minerals. They have peculiar attributes not common to other minerals because of their fugitive nature or vagrant habit—the disposition to wander or percolate, and the possibility of their escape from beneath one part of the surface of the earth to another. Nevertheless, they are to be classed as minerals. [Citing authorities.] In place, they lie within the strata of the earth, and necessarily are a part of the realty. Being a part of the realty while in place, it would seem to logically follow that, whenever they are conveyed while in that condition or possessing that status, a conveyance of an interest in the realty results. It is generally conceded that, for the purpose of ownership and conveyance of solid minerals, the earth may be divided horizontally as well as vertically, and that title to the surface may rest in one person and title to the strata beneath the surface containing such minerals in another.

. . . . . . . . . . . .

" . . . if they are in place beneath the tract, they are essentially a part of the realty, and their grant, therefore, while in that condition, if effectual at all, is a grant of an interest in the realty . . . their conveyance while in place, if the instrument be given any effect, is consequently the conveyance of an interest in the realty." (176 S. W. 719, 720; see, also, *Stephens* v. *Mid-Kansas Oil & Gas Co.,* 113 Tex. 160 [254 S. W. 290, 29 A. L. R. 566, note 586]; *Leonard* v. *Prater,* (Tex. Com. App.) 36 S. W. (2d) 216, 86 A. L. R. 499.)

Under this theory, the possibility of the escape of oil and gas beneath the surface of the assignor's land at the time of the conveyance of an interest in oil and gas in place, as by being drawn off through wells on other lands, is recognized, and gives rise to statements that the owner of the surface, or his assignee of oil rights in the event of a severance of surface and oil rights, has a defeasible fee in the minerals, an estate subject to being defeated through the escape of oil and gas to other lands. But as a development of a logical theory appropriate to the facts, the oil and gas in place doctrine, which in terms describes a grant of an interest in oil rights which is unlimited as to duration as a

present transfer of a defeasible fee in definite corporeal real property, seems not to take into account the circumstance that the oil actually brought to the surface, and to which the assignee's rights attach, may be not only the oil and gas in place beneath the surface of the assignor's land at the time of the assignment, but also oil drawn off from beneath the surface of other lands. There is a further difficulty in applying the oil and gas in place theory, which implies a present transfer of definite corporeal real property, when the operating oil lease is not of unlimited duration, or for so long as oil shall be produced in paying quantities, but for a fixed period of years which may not exhaust the oil, or when the assignment of landowner's royalty is to extend only to oil produced during a fixed period of years.

By reason of these anomalies, as the law relating to oil and gas has developed during recent years, and the relationships arising from dealings in this type of property have been analyzed more closely by the courts, the oil in place doctrine has been rejected by a large number of jurisdictions, and other theories developed, which give due recognition to the fugacious, vagrant nature of oil and other hydrocarbon substances, yet in their logical application protect oil interests as estates in real property. There are intimations of approval of the oil and gas in place doctrine in some of the decisions in this state. (*Graciosa Oil Co.* v. *Santa Barbara*, 155 Cal. 140, 144 [99 Pac. 483, 20 L. R. A. (N. S.) 211]; *Chandler* v. *Hart*, 161 Cal. 405, 414 [119 Pac. 516, Ann. Cas. 1913B, 1094]; *Black* v. *Solano Co.*, 114 Cal. App. 170, 174 [299 Pac. 843]; *Stone* v. *City of Los Angeles*, 114 Cal. App. 192 [299 Pac. 838].) But other cases unequivocally declare that the owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas, and to retain as his property all substances brought to the surface on his land. (*People* v. *Associated Oil Co.*, 211 Cal. 93, 101 [294 Pac. 717]; *Western Oil & Refining Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 741 [24 Pac. (2d) 971, 88 A. L. R. 1271]; *Bandini Petroleum Co.* v. *Superior Court*, 110 Cal. App. 123 [293 Pac. 899]; see, also, *Champlin Refining Co.* v. *Corporation Commissioner of Oklahoma*, 286 U. S. 210 [52 Sup. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403, 412]; *McCoy* v. *Arkansas National Gas Co.*, 175 La. 487

[143 So. 383, 85 A. L. R. 1147] ; *Rich* v. *Donaghey,* 71 Okl. 204 [177 Pac. 86, 3 A. L. R. 352], with note.)

Giving full weight to this statement of the nature of the landowner's rights in oil and gas, we are of the view that an operating lessee under a lease for a term of years, or for a term of years and so long as oil shall be produced in paying quantities, has an interest or estate in real property in the nature of a profit *a prendre,* which is an incorporeal hereditament, and that the assignee of a royalty interest in oil rights under an assignment by the landowner also has an interest or estate in real property in the nature of an incorporeal hereditament.

"Real property" is defined by section 14, subdivision 2, Civil Code, as "coextensive with lands, tenements, and hereditaments", to which Blackstone gives the appellation "things real". (Cooley's Blackstone, vol. 1, 4th ed., p. 443.) At this point it is appropriate to note that the word "property" is commonly used in two different senses. First, it is applied to those external things which are the objects of rights or estates, to those things which, in the language of Blackstone, are objects of dominion or property. (Cooley's Blackstone, *supra,* p. 443.) It is also applied to the rights or estates which a man may acquire in and to things. (Cooley's Blackstone, *supra,* p. 433, including footnote 2.) Thus land, as the object of rights, is described as a thing real, or as real property. The rights or estate which the owner in fee or for life has in land are also described as real property, but those rights which the owner of a leasehold interest has in and to the land or real property, as the object of rights, are not real property, or real estate, but a chattel real, which is personalty. (Sec. 765, Civ. Code; *Jeffers* v. *Easton, Eldridge Co.,* 113 Cal. 345, 352 [45 Pac. 680]; *Summerville* v. *Stockton Mill. Co.,* 142 Cal. 529, 537, 540 [76 Pac. 243]; *First Nat. Bank* v. *Brashear,* 200 Cal. 389 [253 Pac. 143]; *Prairie Oil & Gas Co.* v. *Jordan,* 151 Okl. 147 [3 Pac. (2d) 170, 79 A. L. R. 492]; *First Nat. Bank* v. *Dunlap,* 122 Okl. 288 [254 Pac. 729, 52 A. L. R. 126, 129, with note, 135]; 22 Cal. Jur. 416.) Although not real property or real estate, a leasehold is nevertheless an estate in land, an estate in real property. (Sec. 761, Civ. Code; *Chandler* v. *Hart,* 161 Cal. 405, 413 [119 Pac. 516, Ann. Cas. 1913B, 1094]; *Taylor* v. *Hamilton,* 194 Cal. 768

[230 Pac. 656]; *Harvey* v. *Weisbaum,* 159 Cal. 265, 267 [113 Pac. 656, Ann. Cas. 1912B, 1115, 33 L. R. A. (N. S.) 540]; *German American Sav. Bank* v. *Gollmer,* 155 Cal. 683, 686 [102 Pac. 932, 24 L. R. A. (N. S.) 1066]; *Estate of White,* 53 Cal. 19; *Guy* v. *Brennen,* 60 Cal. App. 452 [213 Pac. 265]; Cooley's Blackstone, vol. 1, *supra,* p. 740.) This duality of meaning should be borne in mind in determining the nature of oil leases and royalty assignments.

The common law included, in addition to lands and tenements, in the category of things real, hereditaments, corporeal and incorporeal, and section 14, subdivision 2 of the Civil Code, noted above, preserves this classification. A hereditament, as defined by Blackstone, included not only lands and tenements, but whatsoever passed to the heirs at law, rather than to personal representatives, "be it corporeal or incorporeal". (Cooley's Blackstone, *supra,* p. 444.) Blackstone lists ten sorts of incorporeal hereditaments: advowsons, tithes, commons, ways, offices, dignities, franchises, corodies or pensions, annuities and rents. Not all are rights in or pertaining to land. The annuity, for instance, is "chargeable only upon the person of the grantor", and "yet a man may have a real estate in it, though his security is merely personal". (Cooley's Blackstone, *supra,* p. 467.) Of the ancient incorporeal hereditaments listed by Blackstone, several either are not recognized at all in this country, or, if they do not involve rights in or to land, are not classed as things real. But a number of the common-law incorporeal hereditaments which involve rights connected with or pertaining to land persist, and are recognized generally as a species of interest in land, or estate in real property. (*Appeal of North Beach & M. R. R. Co.,* 32 Cal. 499, 506, 510, 511; *Smith* v. *Cooley,* 65 Cal. 46 [2 Pac. 880]; *Patchett* v. *Pacific Coast Ry. Co.,* 100 Cal. 505 [35 Pac. 73]; *Corea* v. *Higuera,* 153 Cal. 451 [95 Pac. 882, 17 L. R. A. (N. S.) 1018]; *Painter* v. *Pasadena L. & W. Co.,* 91 Cal. 74, 81, 84 [27 Pac. 539]; *Parsons* v. *Clarke,* 24 Fed. (2d) 338; *O'Sullivan* v. *Griffith,* 153 Cal. 502, 505 [95 Pac. 873, 96 Pac. 323]; *Zlozower* v. *Lindenbaum,* 100 Cal. App. 766 [281 Pac. 102]; *Hoyt* v. *Hart,* 149 Cal. 722, 730 [87 Pac. 569]; *Eastman* v. *Piper,* 68 Cal. App. 554 [229 Pac. 1002]; 1 Tiffany, Landlord and Tenant, pp. 1111, 1112; 9 Cal. Jur. 944.)

The incorporeal hereditament of common is defined by Blackstone as "being a profit which a man hath in the land of another; as to feed his beasts, to catch fish, to dig turf, to cut wood, or the like". (Cooley's Blackstone, *supra,* p. 455.) These are the rights which are described as profits *a prendre,* and they may be several as well as in common. (See discussion, 2 Tiffany, Real Property, 1394.)

Jurists writing since Blackstone's time have remarked that his inclusion of incorporeal hereditaments, together with lands and tenements, as "things", or objects in which dominion or property may be had is somewhat misleading. (See 1 Tiffany, Real Property, 2d ed., p. 9, note 27, citing Austin, Jurisprudence, 3d ed., 371, 804; Digby, History Real Property, 4th ed., 304, note; Hohfeld, 23 Yale Law Journal, p. 23; Salmond, Jurisprudence, 4th ed., 220.) Where the incorporeal hereditament relates or pertains to land, it is, rather, a designation of a certain class of rights in and to land, just as an estate in fee-simple absolute is the designation applied to the rights and interests of the person who has the fullest and most absolute estate in lands known to the law. That rights in and to land, though they are embraced within the definition of an incorporeal hereditament, constitute a limited interest or estate in land, is generally recognized. (See cases cited second paragraph above.) Where this limited interest is to endure in perpetuity or for life, it is a freehold interest, and real property or real estate, as well as an estate in real property. But where it is for years, although an interest in land or in real estate, it is not real estate, but a chattel real, in like manner as a lease for years. Thus in the early case of *Smith* v. *Cooley,* 65 Cal. 46, this court said, in consideration of a grant of mining rights: "This particular estate or incorporeal hereditament is what is known in law as a servitude 'in gross', or a personal servitude, imposed upon land for the benefit of the person or persons owning the right, irrespective of the ownership of the land. The right is usufructuary in its nature and character, and entitles the owner to the use of the land for the profits which may be derived from its rents, or from quarrying and digging it for ores, or from harvesting its fruits, crops, vintages, etc. (Secs. 802–806, Civ. Code.) As an incorporeal hereditament, it is subject to the general rules which govern the enjoyment of real property,

and to the law of descent, devolution and transfer by act of law, according to the freehold or chattel interest acquired in it. . . . ''

As noted above, the definition of ''real property'' given in section 14, subdivision 2 of the Civil Code, corresponds to Blackstone's definition of ''things real''—lands, tenements and hereditaments. Section 801 of the Civil Code lists as ''land burdens or servitudes upon land'', which ''may be attached to other land as incidents or appurtenances'', and which ''are then called easements'', many of the common-law incorporeal hereditaments, including the ''right of taking water, wood, minerals, and other things''. (Subd. 5.) The land to which the easement is attached is called the ''dominant tenement''. Section 802 of the Civil Code lists land burdens or servitudes upon land in gross, which ''may be granted and held though not attached to land'', and includes the common-law incorporeal hereditaments of ''taking water, wood, minerals, or other things'' (subd. 6), and ''the right of taking rents and tolls'' (subd. 4). ▮ There seems to have been some question at common law as to the assignability of servitudes in gross, other than profits a prendre. (*Painter* v. *Pasadena L. & W. Co.*, 91 Cal. 74, 84 [27 Pac. 539].) But under our code, section 1044 of the Civil Code, such servitudes are assignable unless they are expressly or by necessary implication made personal to a particular individual. (*Fudickar* v. *East Riverside Irr. Dist.*, 109 Cal. 29 [41 Pac. 1024].) And at common law a profit a prendre if granted in gross was capable of being transferred in gross. (*Painter* v. *Pasadena L. & W. Co., supra;* 2 Tiffany, Real Property, p. 1392; see Cooley's Blackstone, vol. 1, p. 456, common in gross.) Incorporeal hereditaments in gross have been recognized as a species of estate in real property in many decisions in this state, of which we cite a few: *Appeal of North Beach & M. R. R. Co.*, 32 Cal. 499, 506, 510, 511; *Stockton Gas etc. Co.* v. *San Joaquin County*, 148 Cal. 313 [83 Pac. 54, 7 Ann. Cas. 511, 5 L. R. A. (N. S.) 174]; *Graciosa Oil Co.* v. *Santa Barbara*, 155 Cal. 140 [99 Pac. 483, 20 L. R. A. (N. S.) 211]; *Smith* v. *Cooley*, 65 Cal. 46 [2 Pac. 880]; *Painter* v. *Pasadena L. & W. Co.*, 91 Cal. 74, 84 [27 Pac. 539]; *Arkley* v. *Union Sugar Co.*, 147 Cal. 195 [81 Pac. 509]; *Richfield Oil Co.* v. *Hercules Gasoline Co.*, 112 Cal. App. 431 [297 Pac. 73]; *O'Sullivan* v. *Griffith*, 153

Cal. 502, 505 [95 Pac. 873, 96 Pac. 323].    ▮    In view of the decisions and the provisions of sections 14, subdivision 2, 802 and 1044 of the Civil Code, it cannot be held that the provisions of sections 658 and 662 of the Civil Code limit incorporeal hereditaments in this state to those only which are appurtenant to a dominant tenement.    Section 658 lists land as a species of real property, but it does not attempt to enumerate the various estates which may exist in land, of which an incorporeal hereditament in gross is one.

▮    Under the usual oil and gas lease the owner-lessor transfers to his lessee his right to drill for and produce oil and other substances.    The rights of the lessee present a clear case of a profit *a prendre* in gross, a right to remove a part of the substance of the land.    If the oil and gas lessee is not granted exclusive possession of the surface by the terms of the lease, he has nevertheless a right to such possession as is necessary and convenient for the exercise of the profit, which, in fact, may preclude any other surface possession.    This profit *a prendre* vests in the lessee an incorporeal hereditament, a present estate, an interest in the land, which is a chattel real if it is to endure for years. (*Smith* v. *Cooley, supra; Jones* v. *Pier,* 124 Cal. App. 444, 449 [12 Pac. (2d) 646]; *Beam* v. *Dugan,* 132 Cal. App. 546 [23 Pac. (2d) 58]; *Merrill* v. *California Petroleum Corp.,* 105 Cal. App. 737 [288 Pac. 721]; *Chandler* v. *Hart,* 161 Cal. 405 [119 Pac. 516, Ann. Cas. 1913B, 1094]; *Taylor* v. *Hamilton,* 194 Cal. 768 [230 Pac. 656]; *Jameson* v. *Chanslor-Canfield M. Oil Co.,* 176 Cal. 1 [167 Pac. 369]; *Graciosa Oil Co.* v. *Santa Barbara,* 155 Cal. 140 [99 Pac. 483, 20 L. R. A. (N. S.) 211]; *Richfield Oil Co.* v. *Hercules Gasoline Co.,* 112 Cal. App. 431 [297 Pac. 73]; *Stone* v. *City of Los Angeles,* 114 Cal. App. 192 [299 Pac. 838]; *Bartholomae Oil Corp.* v. *Delaney,* 112 Cal. App. 314 [296 Pac. 690]; *Ewert* v. *Robinson,* 289 Fed. 740 [35 A. L. R. 219, note p. 234]; *Rich* v. *Donaghey,* 71 Okl. 204 [177 Pac. 86, 3 A. L. R. 352, note 378]; see, also, note 59 A. L. R. 701.)

That the lessee has a vested estate in the land prior to production of oil, and although the lease contains provisions for forfeiture upon failure to discover oil, or for breach of covenants of the lease, and although the rights granted are in consideration of rent and royalty to accrue, rather than

upon a cash consideration paid in advance, is established by the above-cited cases. (See note, 3 A. L. R. 378, as to effect of surrender clauses.) Under an ordinary lease of surface rights, with provision for rentals to accrue, a leasehold estate vests in the lessee although the lease contains provision for forfeiture upon conditions subsequent. In *Brookshire Oil Co.* v. *Casmalia etc. Co.*, 156 Cal. 211 [103 Pac. 927], it was stated that prior to discovery of gas and oil, the rights of the lessee are inchoate and no estate vests in him, and this decision has been cited in several cases. However, this qualification was not recognized in a number of the cases cited in the preceding paragraph, and in *Taylor* v. *Hamilton*, 194 Cal. 768 [230 Pac. 656], it was expressly repudiated, as follows: ''Appellants contend that prior to the discovery and production of oil the lease carried only a naked and exclusive privilege to enter upon the premises for that purpose, that is to say, the 'lease' was a mere option to enter the demised premises for the purpose of exploring for oil and is not the lease of an interest in property, but a license. Respondents argue that although the rule in other jurisdictions is that a lease of oil land is a mere license, in California the interest of the lessee under an oil lease is an estate for years and a present interest and estate in land (*Jameson* v. *Chanslor-Canfield M. Oil Co., supra; Chandler* v. *Hart, supra*).

''These authorities support this contention. . . . ''

The royalty return which the lessee renders to his lessor for this estate in the land is rent, or so closely analogous to rent as to partake of the incidents thereof. In the lease in the instant case, executed by Gonzales through his guardian, the lessor's oil royalty is referred to as ''rent or royalty''. In discussing the nature of landowner's royalties, the Supreme Court of the United States said in *United States* v. *Noble*, 237 U. S. 74, 80 [35 Sup. Ct. 532, 59 L. Ed. 844]: ''The rents and royalties were profit issuing out of the land. When they accrued, they became personal property; but rents and royalties to accrue were a part of the estate remaining in the lessor. As such they would pass to his heirs, and not to his personal representatives. . . .

''It is said that the leases contemplated the payment of sums of money, equal to the agreed percentage of the market value of the minerals, and thus that the assignment was of

these moneys; but the fact that rent is to be paid in money does not make it any the less a profit issuing out of the land."

That the right to receive future rents and oil royalties is an incorporeal hereditament, an interest in land, is recognized in the following cases: *Schmid* v. *Baum's Home of Flowers,* 162 Tenn. 439 [37 S. W. (2d) 105, 75 A. L. R. 261, note 270]; *Winnisimmet Trust, Inc.,* v. *Libby,* 232 Mass. 491 [122 N. E. 575]; *McMenamy Invest. & Real Estate Co.* v. *Dawley,* 183 Mo. App. 1 [165 S. W. 829]; *Arrington* v. *United Royalty Co.,* 188 Ark. 270 [65 S.. W. (2d) 36, 90 A. L. R. 765]; *State* v. *Royal Mineral Assn.,* 132 Minn. 232 [156 N. W. 128, Ann. Cas. 1918A, 145, with note, 148]; *Roberson* v. *Pioneer Gas Co.,* 173 La. 313, 314 [137 So. 46, 82 A. L. R. 1264, 1268]; *McIntire* v. *Bond,* 227 Ky. 607 [13 S. W. (2d) 772, 64 A. L. R. 630]. In *Schmid* v. *Baum's Home of Flowers, supra,* the court had under consideration the question whether an assignment of rents, in that case a money rental upon a building lease, rather than an oil lease, was subject to recordation. The court held that such assignments were subject to the registration laws, except that as a lease for a period of three years or less was not required to be recorded, a like exemption should be implied as to assignments of rent for a similar period. In several recent decisions in this state oil royalties have been treated as rents. (*Beam* v. *Dugan,* 132 Cal. App. 546 [23 Pac. (2d) 58]; *Kern Sunset Oil Co.* v. *Good Roads Oil Co.,* 214 Cal. 435 [6 Pac. (2d) 71, 80 A. L. R. 453, with note, 461]; *Adams* v. *Petroleum Midway Co.,* 205 Cal. 221 [270 Pac. 668]; *Clark* v. *Richfield Oil Co.,* 127 Cal. App. 495 [16 Pac. (2d) 162].)

Thus, the recognition of oil royalties as rents affords a basis for sustaining an assignment of oil royalty by a landowner as a transfer of an interest in real property. But where an assignment by the landowner of an interest in his oil rights is not limited to oil to be produced under a particular lease, but is in perpetuity, as is the assignment to the Martins in the instant case, with the intent that the interest shall survive a forfeiture or other termination of the lease, there is more than a transfer of rent or royalty to be rendered under a lease in effect at the time of the assignment and under future leases. In *Jones* v. *Pier,* 124

Cal. App. 444 [12 Pac. (2d) 646], in which a petition for hearing in this court was denied, the appellate court held that under an assignment of oil royalty limited to the duration of a particular lease, the operating lease cannot be terminated by agreement between the lessors and operating lessee without the consent of the assignee of an oil interest. This decision was recognized with approval in *Metzler & Co. of California* v. *Stevenson*, 217 Cal. 236 [18 Pac. (2d) 330], and in *Beam* v. *Dugan, supra,* in which this court denied a petition for hearing.

In *Beam* v. *Dugan, supra,* it was held that the rights of the assignee of oil royalty to share in oil produced extend not only to the lease in effect at the time the assignment is made, but to all future leases where the assignment of oil rights is unlimited in duration. In *Jones* v. *Pier, supra,* it was held that where the assignee's rights are limited to a particular lease, said lease cannot be terminated without the assignee's consent. Where, under the assignment of oil rights, the assignee's rights are not limited to a particular lease, but are in perpetuity, under the rule of *Beam* v. *Dugan, supra,* that the assignee's rights extend to oil produced under all leases, it must be held that such future leases cannot be terminated without the assignee's consent. It must follow, if such assignee must be a party to any lawful termination of leases, that he must have a right to participate in entering into new leases for production of oil upon the premises. We are of the view that an assignee of a royalty interest becomes in effect a tenant in common with his assignor who retains an interest in the oil rights, and with other assignees of percentage interests, in the right which the assignor had, by virtue of his ownership of the fee in the land, to drill for and produce oil. A several right of the owner becomes a right exercisable by him jointly with others. We are not here holding that the lease which Callahan entered into after the conveyance to him, and in which the Martins presumably did not participate, is invalid as to them. All the circumstances connected with said lease are not before us. For all that here appears, the Martins acquiesce in said lease and claim only oil rights as to three per cent of oil produced thereunder.

What we have said here implies a right of entry for the production of oil in assignees of oil rights equally with the

lessor-owner who retains a partial interest in oil to be produced. Of course, we are not to be understood as here holding that an assignee of oil rights may exercise a right of entry while a valid operating lease is in effect which confers an exclusive right to enter, drill for and produce oil on the lessee thereunder. The assignee of oil rights takes subject to existing leases of which he has notice, actual or constructive. In this analysis, the assignee of an oil royalty not limited to the duration of a particular lease has a right in the nature of a profit *a prendre* in the land, and this right constitutes an interest in said land, an estate in real property. Of course, it is not to be contemplated from the circumstance that tenants in common in oil rights have coequal rights of entry, that a large number of investors holding assignments of small percentages in oil rights will wish, each for himself, to undertake the production of oil. It is not necessary for us here to determine in detail the rights *inter se* of those who as tenants in common are jointly interested in oil rights in land. The question is the subject of two recent annotations in American Law Reports, in which decisions are cited which recognize that a tenancy in common may exist in oil rights independently of surface rights, even though the oil and gas in place theory is rejected. (40 A. L. R. 1400, note to *Prairie Oil & Gas Co.* v. *Allen,* 2 Fed. (2d) 566 [40 A. L. R. 1389]; 91 A. L. R. 205, note to *Earp* v. *Mid-Continent Petroleum Corp.,* 167 Okl. 86 [27 Pac. (2d) 855, 91 A. L. R. 188].) If numerous holders of oil rights in a single parcel of land are unable to agree upon an operating lessee or upon the terms of an oil lease, we are inclined to think that the powers of a court of equity may be invoked to formulate a just and reasonable plan for the development and production of oil upon the land, and to settle the controversy in accordance therewith. But this can be determined as the question may arise in future litigation. The rules of law should be sufficiently adaptable to reach a desirable result in this developing field of the law.

What we have said here applies although the assignment of the undivided interest in oil rights is silent, as in the instant case, as to any right of entry in the assignee. The right exists by virtue of the unqualified grant to the assignee of an interest in oil to be produced from the land, in like manner as certain rights follow without express enu-

meration from an ordinary deed absolute of real property. One who grants a thing is presumed to grant also whatever is essential to its use. (Sec. 3522, Civ. Code; *Smith* v. *Cooley,* 65 Cal. 46 [2 Pac. 880]; *Cave* v. *Crafts,* 53 Cal. 135, 140; *Sulloway* v. *Sulloway,* 160 Cal. 508, 513 [117 Pac. 522]; *Davison* v. *Reynolds,* 150 Ga. 182 [103 S. E. 248].) The right of entry is an incident to the grant of an estate in the mineral rights.

In support of their contention that a right of entry cannot be implied under such circumstances as we have outlined above, respondent relies earnestly on *Morgan* v. *McGee,* 117 Okl. 212 [245 Pac. 888]. In that case the owner of land granted to another all oil and other minerals beneath the land. It was held that this assignment conferred no rights against the subsequent grantee of the fee, as a right of entry could not be implied. The court made a distinction between the situation where the owner of land conveys to another, reserving ownership of the oil and other minerals in himself, in which case a right of entry is implied (*Newbern* v. *Gould,* 162 Okl. 82 [19 Pac. (2d) 157]), and the case where he assigns the oil and minerals to another, retaining ownership of the general estate in the land, in which case the right of entry must be expressed. We are of the view that this distinction is not supported by reason, and that the basis of the court's holding that a right of entry is implied upon a reservation by the landowner of oil and minerals to himself—that equity will not permit a right to fail for want of a remedy to enforce it—applies with equal force to a grant of such mineral rights. The decision of the Oklahoma court is probably in conflict with its decision in *McKernon* v. *Josey Oil Co.,* 106 Okl. 100 [233 Pac. 451], decided the preceding year, and we have found no subsequent Oklahoma case where *Morgan* v. *McGee, supra,* has been relied on to defeat an assignee of mineral rights. Such a rule would be at variance with the principle, supported by *Metzler & Co. of California* v. *Stevenson, supra, Jones* v. *Pier, supra,* and *Beam* v. *Dugan, supra,* that the holders of oil royalty interest have a right to participate in the termination of existing leases, and the principle which follows therefrom, that they have coequal rights as to executing new leases. These rules imply coequal rights of entry. The holders of oil interests under a landowner's assignments

have rights of profit *a prendre,* which are estates in real property, and are properly described as real property, or real estate, where, as in the instant case, they are to endure in perpetuity.

It is unnecessary here to determine the effect of our decision in the instant case on the nature of royalty interests created by an operating lessee, rather than by the landowner-lessor, as in the instant case. This question was involved in such cases as *Western Oil etc. Co.* v. *Venago. Oil Corp.,* 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271]; *Black* v. *Solano Co.,* 114 Cal. App. 170 [299 Pac. 843]; *Merrill* v. *California Petroleum Corp.,* 105 Cal. App. 737 [288 Pac. 721]. In these cases the doctrine of potential possession of personalty—the oil severed from the land and brought to the surface—was applied. This doctrine has since been abolished by the adoption of section 5 of the Uniform Sales Act, section 1725 of the Civil Code.

The assignments of oil royalty to the defendants Martin herein, by plaintiff Callahan's predecessor in ownership of the general estate in the land, vested in the Martins an estate in real property described in plaintiff's complaint, and the recordation of the assignment charged plaintiff with constructive notice thereof.

The judgment is reversed.

Rehearing denied.